Ok, 8 comes up now, and this is Arulampalam v. Ashcroft Good morning. This case was heard on consecutive days with the other case, and also decided on a credibility issue, but for different reasons. There was no problem found with the airport statement, which said very little, but the judge decided this on what he called a demeanor and the method of answering questions. And the judge himself thought it created demeanor. Just a general question, though. The transcript in this case from the IJ hearing is extremely strange in that the petitioner was portrayed as speaking broken English all the way through. So, of course, presumably what is being recorded is what the translator said, not what he said, right? Yes. So, essentially, it was translating into very broken English. I mean, just grammatically incorrect, not coherent English. Is that what you take from the transcript? Well, insofar as there's grammatical errors, I think that, you know, nobody would translate grammatical errors into English. Well, what I'm saying is that you get the impression from reading the transcript, which may be the impression the judge was getting, some of which seems to have been the result of the translation, because you have, I mean, it's usually when translators translate, they translate into something that sounds like English. But in this instance, you have translation into sentences without articles and without just not the way people usually speak English. So that's all the translator was trying to do. Why should we assume, counsel, that it's the translator when we know in the other case it happens to be before us it's the same translator and it doesn't read like this? Well, actually... You assume that one day he was incompetent and the next day he was competent? There is... Let me ask you this, just before you get to that. Was there the same court reporter there? In the immigration court, they just have a... They have a machine. They have a four-track cassette. Yeah. And it's all on tape. You can see the transcripts. If you're going to tape three, they pause for a few seconds and put the new tape in. But who types it up? They send it off to a contractor, usually in the suburbs of Washington, D.C. It could be two completely different transcribers. That could be... I mean, for example, do they speak Tamil? They speak Sinhalese language, not... They speak the Sinhalese language. Then, I mean, it's all the way through here. Just a strange way of translating into English. I failed to see what the transcriber... Why the transcriber would make any difference. The IJ wasn't listening to the transcriber. He was listening to what was being said. And that's how he made his decision. And it's the same translator in these two cases. Yes, well... And that would seem to me, if one's going to draw an inference, one would infer that this fellow was actually doing it that way, and the translator was translating what he said. Your Honor, I'm not trying to make a big issue about the translator. I think that even in the other transcript, there's evidence of some difficulty in communication because of the translator. And I could actually point to passages there, but... But it doesn't look like the problems this guy has. I think this immigration judge has heard a lot of cases, and he knows who translators are and how they interpret. But what the IJ pointed to was, several times, what he called fragmented speech. And for him, that was a cue that it's a fabrication. If you can't tell a logical, linear story, he thinks you're trying to remember something that you remember improperly. And he did that. He said that several times during the hearing itself and in his oral decision. So I could cite those pages, the excerpts on page 98, 213, and 237, for instance. That was really, as far as I can tell, his main focus. Even though he says it's demeanor, he doesn't say anything about, you know, his facial expression or his body language. He considered these fragments to be evasive. And this man is not highly educated. He quit school at about 15 years old and went back to farming. And I think that the judge was able to get the meaning out of what the Petitioner here was saying, but it bothered him that he couldn't get it in a logical syllogism laid out like a lawyer might say it, I guess. He doesn't give the lawyers that much credit. Go ahead. It wasn't just the syllogism. He didn't really say, the problem is, this guy has all kinds of stories, but he doesn't have any details. He doesn't, he, anytime you ask a detail, he says, well, I don't know anything about that. He doesn't know anything. He lived it, but he doesn't have any details about it. And he's got reasons, but he doesn't have any detail. Isn't that what really happened? Well, he has a lot of details about, you know, how he went to the market and he was arrested and what happened when he was arrested. And, in fact, one of the things is that when he starts giving details, the judge starts getting angry at him. He says, I went there, I took the shovel, I went home, and the judge says, why are you mentioning the shovel? Yes. Because he was telling the story the way it happened. Yes. So in a sense, this is, you know, there's some interference from the judge, as in Garavillas, in which here a Los Angeles judge made a number of sarcastic remarks, and the Court reversed him because he said, They put the shopping bag with petrol in my head, and the judge interrupts and says, by petrol you mean gasoline. Well, of course by petrol I meant gasoline. What's wrong with calling petrol petrol? And there's, all the way through, there's this kind of patronizing tone that I find very disturbing. Yes. I believe this judge, well, maybe in the, I know, I know Judge Warren. He's, he tends to be suspicious of this type of case. I will keep what you say, counsel. Okay. But I think in the context, this was just after 9-11, and everybody was even more, you know, afraid of credibility issues and terrorists. Our government for several years has called the Tigers terrorists, and maybe this was, although it's unspoken here, maybe they're thinking all these guys could be terrorists, although I don't think the Tigers have ever been. Are they on the Attorney General's list? They are, but not because of threats to the United States, because it's a foreign policy issue with supporting Sri Lanka, I believe. I never heard of any terror, history of Tamil threats here in the United States, but that's not in the record. But that, in the context of 9-11, that might be an issue. So I, I just don't, I would, I would urge that there really is no cogent specific reason about demeanor except for the fragmented manner of speech. And, for instance, there's a, there's a big question made about what do the letters L-T-T-E mean? Well, in South Asia, and I guess in most places, the, all the languages are infused with some English, and so L-T-T-E is the international shorthand, but that's not an, that's not an acronym for the Tamil word for it. So he doesn't know what the English words equal to L-T-T are, but that was a big issue. Well, maybe you're fabricating because you don't know this. On the other hand, there's no issue that he's a Tamil from Sri Lanka. If he's from there, he would know what L-T-T is. He just wouldn't know the English words for it. So things like that, the judge was annoyed at, you know, even words he used for his family relationships. And even, even if there are still doubts about his credibility, we would urge that he's, he deserves relief under the convention he has tortured because he has described in vivid detail being tortured, and he would very likely suffer that again. If you don't believe him, you don't believe something else, you know, you get, you know, you're not going to do any better under one dimension than the other. If the story is believed, it's not believed. Well, the Rotenheim case a couple of years ago, it was a motion to reopen after the torture convention became a remedy available, and this Court said it's a separate analysis. It's a separate analysis, but if all this never happened, it never happened. It doesn't really, it doesn't, you don't get to accept it now. Well, if he's, if he's in a population that's highly vulnerable, then it could be eligible even without being perfectly credible. But I think that the judge's analysis does not have specific and cogent reasons that find him incredible, and that his story was understandable, even though poorly expressed, and that he deserves relief. My time is up. Okay. Thank you. Good morning again. May it please the Court. I'm Cindy Ferrier, and representing the government in this matter. The Court in this case is reviewing the immigration judge's adverse credibility determination. However, more specifically, the Court is reviewing the immigration judge's findings with regard to the petitioner's demeanor. This Court has determined that demeanor findings are to be accorded special deference. But this isn't really demeanor. It's a characterization of his language and fluidity and lack of linear thought and so on. It isn't a statement about how he appeared on the stand, things that we can't review. It's specifically things that we can review. Well, as the Court had noted in the previous case, Peretti's Eurostatsrazu, I'm not pronouncing that properly, but the Court there did note that it considered that the immigration judge was considering things such as modulation or pace of speech and other non-verbal things. He wasn't saying that either. He said things about fragmentation. He didn't like the fact that he was using words, these relational words instead of people's names. He thought he should have known about what registration was, which I'm not sure what its implications were, which I'm not sure why, and so on. But he wasn't basing it, as far as I can tell, on anything that we can't review in the record. Well, I'm not saying that you cannot review it even if you were to determine it was a demeanor finding. If he said the problem was that he looked at the floor every time he said something, I'd have a hard time disagreeing with that or reviewing it. But that's not what he was saying. Well, I think, I mean, not to get bogged down in whether it is, you know, I wouldn't, as again, I wouldn't be saying that if it's a demeanor finding, you don't review it. I would just say that then there would be special deference. But I think that this could be considered a demeanor finding by the fact that he noted the way that he spoke, the manner in which the fragments came out, and that is something that in some of the demeanor cases, you have, the Court has noted as being something that the immigration judge who is there, who is present, who is witnessing the petitioner and hearing the language as it comes out, has a better ability to evaluate that than perhaps a court that's reviewing on a cold record and just the transcripts may get a feel for. I mean, I actually find the immigration judge's behavior to be quite sound. I mean, for example, with the discussion about the shovel. He's relating a story. He says he has the shovel. And all of a sudden, the immigration judge starts out with, well, what about the shovel? What does the shovel have to do with your story? Why are you telling me about the shovel? That's what I take at my house. He's saying it's perfectly sensible. And the judge says, I don't understand why you even mention the shovel, sir. What does the shovel have to do with your story? And it actually had a lot to do with his story. It was explaining why he had to take the shovel home in order to go somewhere else, so that he had to go home first before he could go to the bunker. And it was critical. But why was the judge getting into it? I mean, there was a difference. It would demonstrate the immigration judge's frustration, I guess, with the testimony up until that point and the fact that it was so fragmented, not gold-recorded, wasn't linear. He was having to develop each and every point as it came up. For example, close to the beginning of the testimony, when Petitioner was asked, who are the tigers? And he says, his response to that is, one of my brother. He's asked the follow-up question, is one of your brothers a tiger? His answer to that is, he's not my brother, but he came and took me to the bunker. Well, what's an immigration judge supposed to do with that in conjunction when you consider that the entire testimony is replete with instances such as that? And there's other instances where his answers just simply aren't responsive. They just don't go to the question that we're asked of him, such as — And there are a lot of other instances where they do and which are perfectly coherent, in which the judge doesn't seem to think are coherent for some reason. Well, there's — I mean, there are answers that are coherent but don't necessarily go to the — to developing his claim overall and don't provide further detail as to the specifics of his claim. The Petitioner — or the immigration judge didn't only rely on the lack or the fragmentation and the lack of direction of the Petitioner's testimony. He also considered that in conjunction with certain other factors that he found to detach from the Petitioner's credibility, such as the fact that the Petitioner stated that he was able to travel from tiger territory to government territory without having any special passes. And he said that because somehow they managed to get around the pass — the checkpoint, which was presumably what people who were trying to sneak someone through the checkpoints because they're afraid that they're going to be attacked for two. And somehow they did it. Who knows how they did it? But it wasn't a nonsensical answer. Well, it's not — but it also provides absolutely no detail to the immigration judge with regards to something that was pretty central to his claim. His overall story is that people — some people, his relatives took care of him. He was a pretty young guy at the time and arranged for him to get there and arranged for him to be registered and arranged for him to get out of the country. And I don't — what's wrong with that? Why would he have to know everything? Because — simply because he cannot provide — because the immigration judge doesn't necessarily believe that the underlying events which form the basis for his persecution ever even happened. He doesn't — based — because of the fragmented stories, because of the fact that he wasn't able to answer in the way which the I.J. found logical and fully developed, the I.J. doesn't find that he, in fact, experienced those two instances of persecution. Your point was that the I.J. was entitled to rely on the fact that he didn't know the details of how the people who were older experienced people were shepherding him through in order to keep him safe. He doesn't know how they did it, but that shows he's not being truthful. Well, I'm saying that in conjunction with the — well, what I'm calling the demeanor finding, in conjunction with the lack of detail with regards to certain other aspects, and in conjunction with the fact that the immigration judge noted that he doesn't provide any sort of corroboration with regards to the treatment that he would have allegedly received, although he had persons that he was living with for approximately six months after the treatment that could have submitted some sort of documentation. And in addition to that, the fact that he was able to live there for seven months after his alleged release without being — Well, he explained that pretty clearly, too. He said that he was registering every week, but then he heard that people who went in on a certain day to register were getting arrested, so he left. Well, again, not thinking of all of these in a vacuum, the immigration judge, again, took that in context with what he found to be very confusing testimony, which didn't meet the burden of proof which the immigration judge — or which the law provides. Well, but for example, the immigration judge thought that that was, for some reason, an implausible story. Why would you think you're going to get arrested on a certain day after you haven't gotten arrested for seven months? He said why. Because he heard rumors that — he heard that people were getting arrested that week. What was wrong with that as an answer? I mean, whether you believe it or don't believe it, you don't disbelieve it because there's something inherently implausible about it. What the immigration judge's job is to evaluate the story and to — I understand that. What I'm saying is this. It's one thing to say, I have a reason why I don't believe that he — it's one — let me be more articulate. He regarded that as an implausible story that impeaches credibility. The fact that after he had been reporting for seven months, he concluded that it was time to leave because people were getting arrested that week, that's implausible. What's implausible about that? That in conjunction with the other things. That specific event — He pointed to that particular thing as being implausible. Well, that particular statement, that he was safe and then that he was doing what he was told to do and then that he had heard that others had been arrested — Yes. If the immigration judge doesn't feel as though the rest of the testimony is true — No, but I'm asking you, this is just an example of the kind of credibility determinations that were being made. He said that's implausible. And what is implausible about that standing by itself? He said that by itself was implausible. That his — not — the fact that he had — that he believed that he would allegedly be arrested as well, in and of itself, the immigration judge — I mean, I don't know how to answer your question other than to say that — It's an example, I think, of why — How about he drew no connection between the other people and himself? And he managed to leave the country after that amazing revelation within about two days, which is fairly unusual, too, isn't it? But he doesn't know how. Right. The IAJ did say that, didn't they? Yes, he did. He did point that out in his decision. So I would argue that the evidence in this case, which, again, if we go even with the fact that it's just an adverse credibility determination, is something that is supported by substantial evidence in the record, and that the evidence doesn't compel that this Court overturn that decision. Thank you. All right.
judges: Pregerson, Fernandez, Berzon